**COLUMBIA BROADCASTING SYSTEM, INC., Plaintiff,**

v.

**ZENITH RADIO CORPORATION and The Rauland Corporation, Defendants.**

**No. 71 C 687.**

United States District Court, N. D. Illinois, E. D.

March 17, 1975.

As Amended March 18, 1975.

See also, Jud.Pan.Mult.Lit., 329 F. Supp. 540.

Herbert P. Kenway, and George W. Crowley, William A. Van Brunt, Kenway & Jenney, Boston, Mass., James R. Sweeney, Coffee & Sweeney, Chicago, Ill., for plaintiff.

Dugald S. McDougall, Francis W. Crotty, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

McLAREN, District Judge.

### I.

### INTRODUCTION

This matter arose as an action by Columbia Broadcasting System, Inc. (CBS) for infringement of U.S. Letters Patent No. 2,690,518 (hereinafter referred to as the '518 patent or the Fyler and Rowe patent) and infringement of U.S. Letters Patent Nos. 3,179,836 and 3,222,172 (hereinafter referred to as the Giuffrida patents). The Court has examined all of the testimony and exhibits presented, and being fully advised of the premises, finds that the Fyler and Rowe patent and Giuffrida patent 3,179,836 are valid and infringed by the Zenith Radio Corporation's (Zenith)[1] devices. The following shall constitute the Court's findings of fact and conclusions of law pursuant to F.R.Civ.P. 52(a).

### II.

### HISTORICAL BACKGROUND

The instant litigation involves three patents whose subject matter is used in color TV picture tubes. To understand the purpose of the patents in suit and

---

1. CBS also sued the Rauland Corporation, Zenith's television tube manufacturing subsidiary. Rauland has since become a division of Zenith and thus the defendants will be referred to collectively as "Zenith."

their place in the color TV industry, a brief excursion into the development and history of color TV is necessary.[2]

Public broadcasting of television, as of radio, is lawful only when carried on under license of the Federal Communications Commission and in accordance with its prescribed "standards." Those standards result in a single uniform type of electrical signal for each broadcasting service which home receivers are designed to receive. Prior to 1949, the FCC had adopted no standards for color television. In that year, however, the FCC invited industry proposals directed to the etablishment of such standards. An acceptable color television system requires complementary components among which are the viewing camera, the transmitter circuitry, the receiver circuitry and the picture tube at the receiving end.

CBS and RCA were early proponents of color TV systems, which were demonstrated to the FCC in November 1949 along with others. The CBS system, a "field sequential" system, was adopted by the FCC as the national standard in November 1950 and remained the national standard until December 1953. This system produced an acceptable color picture by placing a spinning disc in front of a monochrome tube. The spinning wheel system, however, was not compatible with several million existing, convential black and white receivers. Thus, research continued with an eye to development of a color TV tube which would receive conventional black and white programs as well as color programs.

After an extensive research program, RCA finally developed a single picture tube all-electronic color TV receiver. Thousands of phosphor dots in trios of red, green and blue were deposited upon a flat glass plate to form the screen. Three electron guns grouped at slight angles to each other at one end of the tube each produced a beam of electrons to excite phosphors of a given color emanation. To assure that electrons from the "red gun" struck only "red" phosphors, those from the "green gun" struck only "green" phosphors and those from the "blue gun" struck only "blue" phosphors, a thin flat metal sheet having a single perforation for each trio of phosphor dots was interposed between the guns and the phosphor dots.[3] That perforated sheet was called a "shadow mask" because the areas between perforations "shadowed" or shielded all of the phosphor dots of two of the colors from the beam from any gun. The mask and the phosphor dot screen were parallel to each other. In other words, the goal of the red beam striking only red dots, the green beam striking only green dots and the blue beam striking only blue dots was achieved because each beam came through the mask apertures at an angle which permitted it to strike only its associated phosphor dots. This system became the accepted FCC color TV standard in December 1953.

The RCA tube, while commercially acceptable, was not perfect. The major problem with the tube was keeping the shadow mask aligned with the phosphor dot screen. Eighty-five per cent of the electrons emitted by the electron guns

---

2. For a fuller discussion of the history of color TV, see the decisions in Columbia Broadcasting System v. Sylvania Electric Prods., 294 F.Supp. 468 (D.Mass.1968), aff'd in part, remanded in part, 415 F.2d 719 (1st Cir. 1969), cert. den., 396 U.S. 1061, 90 S.Ct. 755, 24 L.Ed.2d 755 (1970). The Sylvania litigation involved the patents in suit here. The '518 patent was found valid by both the district court and the Court of Appeals; the Giuffrida patents were found valid by the district court but the Court of Appeals remanded the validity issue to the district court to examine the file wrapper to determine the scope of the patents. The Sylvania litigation was settled before the district court could conclude this new inquiry. The effect of the Sylvania decision on this litigation will be discussed below.

3. Although electron beams have no color, TV engineers identify the beam with the color emitted by the phosphor dots it strikes. The excited phosphors produce photons of various wave lengths, not the electron beams.

hit the metal sheet; only 15% passed through the apertures and hit the screen. The electrons that hit the metal mask heated the mask and caused it to expand. When the mask expanded, the apertures moved, causing the various electron beams to hit the wrong phosphor dots (misregistry). This substantially decreased color fidelity. RCA solved this problem by preheating the mask to operating temperatures and tightly clamping it into a rigid metal frame.[4] When the mask then cooled, it was unable to move and, assuming it was properly aligned in the first instance, the mask was thus in proper alignment when operating during the warm-up cycle as well as when operating at rated temperatures.[5]

The above-described solution to the shadow mask alignment problem created difficulties both for the viewer and the manufacturer. Operating the drumhead tube at levels of brightness suitable for viewing in a normally lighted room required the intensity of the electron beams to reach levels so high that the mask was heated above the temperature at which it was tensioned. When such levels were reached, warping occurred and, once again, color fidelity was lost. Even a bright area in a picture being presented could cause localized heating in the mask and resulting areas of color smearing. Moreover, the drumhead tube created a small picture (the RCA commercial tube had a 15 inch viewing screen) for a relatively large tube envelope.

From the standpoint of the manufacturer the tube was unsatisfactory because the heavy internal assembly, or "color sandwich"[6] had to be heated to a high temperature to drive out occluded gases as the necessary vacuum was being drawn within the tube.[7] There was also the added cost of equipment and labor involved in the operation of heating and clamping the mask in its frame.

In the early 1950's other electronics manufacturers continued experiments to attempt to develop solutions to the picture tube problem. For example, Philco was hard at work developing its code named "Apple" tube which operated on entirely different principles and did not employ a shadow mask at all although the picture was displayed on the face plate of the tube. Another type was the so-called "Lawrence" tube in which the electron beam or beams passed through a grid of parallel wires to be deflected in required directions by circuits which varied the voltage between the grid and the phosphor screen. The Apple and Lawrence tubes never became commercial, and there were also other experimental types which fell by the wayside.[8]

### III.

### THE FYLER AND ROWE SOLUTION

This historical background describes the state of the art in 1953 when CBS developed the tube which embodies the '518 patent in suit. Color fidelity in TV tubes had been a long standing problem in the industry which many major corporations and scientists had attempted to solve. Until the Fyler and Rowe invention, no solution had been entirely satisfactory. The RCA drumhead tube

---

4. Since the mask when clamped was under considerable tension, the RCA tube received the nickname "drumhead" tube.

5. The mask, phosphor screen, and frame were then placed in the tube envelope and mounted in proper geometric relationship with the electron guns. The picture on the phosphor screen was viewed by looking into the tube through a transparent faceplate.

6. See footnote 5, *infra*, for a description of the "color sandwich." This portion of the RCA tube weighed some 6 pounds.

7. If the occluded gases were not removed, the vacuum in the tube would be insufficient and the tube would have a very short operating life.

8. The relevancy of these conceptions of color TV tubes as prior art to the '518 patent will be discussed below. See page 788, *infra*.

solution had been advanced to the stage of commercial development but consumer dissatisfaction and manufacturing difficulties limited the market for this type of tube.

The Fyler and Rowe solution to the color fidelity problem abandoned the RCA approach. Fyler and Rowe conceived of a tube with a curved spherical shadow mask free from lateral tension matched with a curved spherical viewing screen with phosphor dot trios placed on the inside of the viewing screen.[9] Such a system has two major beneficial features: (1) when heated, the mask expands radially (along its axis) and radial expansion does not cause the apertures to become misaligned with the phosphor dot trios as would lateral expansion (thus color purity is maintained); and (2) since the mask is not under lateral tension requiring a clamp and the phosphor dots are directly on the face plate the tube has fewer surfaces to trap gas, thus the production heating cycle to drive out occluded gases is substantially shorter. This obviously reduces manufacturing costs.

Zenith maintains that this Court cannot consider the disclosure of the '518 patent on axial expansion of the mask because explanation of that feature was a "new matter" added by amendment. The patent laws do not allow disclosure of new matter by amendment. In the instant case, however, this principle is inapplicable because CBS in its original disclosure did discuss the thermal properties of the mask. The file wrapper of the '518 patent shows the original '518 patent application included this statement: "such expansion as may be encountered is taken up over the entire surface (of the mask) resulting in negligible amplitude displacement." This language, although somewhat inartful, clearly shows that CBS disclosed the thermal properties of the mask from the beginning.

## A. The Weight to be Accorded the Previous Finding of Validity

A threshold issue is how much weight is to be accorded to the finding of validity of the '518 patent by the Massachusetts district court and the First Circuit. Due process prohibits technically estopping Zenith from challenging validity despite the existence of an adjudication on the identical issue which squarely stands against its position. Blonder-Tongue Labs., Inc. v. University of Illinois Foundation, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971); Hansberry v. Lee, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940); Bernhard v. Bank of America Nat. Trust & Sav. Ass'n, 19 Cal.2d 807, 122 P.2d 892 (1942). One cannot be bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party through service, substituted service or the class action mechanism. Cf. Pennoyer v. Neff, 95 U.S. 714, 24 L.Ed. 565 (1877).

This does not mean, however, that a prior adjudication of validity should be given no weight. Federal courts have consistently held that a prior finding of validity against a different defendant is entitled to comity and therefore the usual presumption of validity attaching to a patent is in such instances increased. See e. g., General Tire & Rubber Co. v. Firestone Tire & Rubber Co., 489 F.2d 1105 (6th Cir. 1973), cert. den., 417 U.S. 932, 94 S.Ct. 2643, 41 L.Ed. 2d 235 (1974); Safe Flight Instrument Corp. v. McDonnell-Douglas Corp., 482 F.2d 1086 (9th Cir. 1973).

The policy reasons behind the Blonder-Tongue decision also indicate that prior adjudications of validity are to be accorded great weight. In Blonder-Tongue, the Supreme Court held that a patentee is estopped to assert the validity of a patent that has been declared invalid in a prior suit against a different

---

9. The Fyler and Rowe invention in suit here is described in claim 7 of the '518 patent.

See Appendix A for the full text of the '518 patent.

defendant unless the patentee demonstrates that he, substantively and evidentially, did not have a full and fair opportunity to litigate the validity of his patent in the prior suit. At the foundation of the Court's decision was the recognition that patent litigation is very costly to the litigants and time-consuming for the federal courts. The Court also noted that a patent by its very nature is affected with a public interest. To encourage scientific development and promotion of the useful arts, holders of valid patents should be justly compensated. Holders of patents previously found invalid, on the other hand, should not be able, through the coercive effect of forcing a defendant to expend funds on defense of an infringement suit, to accept license agreements on an invalid patent. Moreover, inconsistent judgments on the validity of a patent can disrupt the competitive mechanisms of the marketplace because price differentials will develop between those manufacturers who must pay royalties to the patentee and those manufacturers who need not make such payments.

With these policy considerations in mind, this Court believes that a prior finding of validity should be given as much weight as possible consistent with the dictates of due process. Without violating due process, a court can require a defendant to prove that a factual or legal error occurred in the previous adjudication of validity or that the previous litigation was incomplete in some material aspect. This proof could consist of evidence that the defendant in the first litigation failed to bring to the first court's attention relevant prior art or that the first court did not adequately apply the standards of 35 U.S.C. § 103 as articulated by Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).[10] If defendant could not come forward with any such evidence, summary judgment under F.R. Civ.P. 56 might well be appropriate. Once the defendant had come forward with additional relevant prior art or other additional data tending to invalidate the patent, summary judgment would no longer be appropriate, the prior adjudication of validity would still be entitled to substantial weight but could not be determinative. Of course, the more new evidence defendant produces, the less weight the initial finding of validity is to be accorded.

In the instant case, Zenith introduced relevant evidence not considered by the previous courts in their adjudications of validity. Thus, under the present circumstances the traditional application of the comity doctrine and the more expanded notions of the comity doctrine expressed herein reach the same result— the prior adjudication of validity cannot be determinative but is only entitled to substantial weight as evidence of validity.[11]

## B. *Obviousness*

Under 35 U.S.C. § 103 an invention is unpatentable if at the time of the development the invention was obvious to one skilled in the art. To test whether an invention is obvious, "the scope and

10. This approach is similar to the *Blonder-Tongue* standard of a full, fair opportunity to litigate substantively and evidentially. A distinction exists, however. In the present case the prior finding of validity is only a piece of evidence (albeit a strong one) while in the *Blonder-Tongue* situation the prior adjudication of invalidity acts as a bar to further litigation unless the patentee can prove the first litigation was so seriously defective as to be entitled to almost no weight at all. Where a prior finding of validity exists, a defendant need only bring forth some quantum of new, relevant evidence to obtain a full trial on the merits while the patentee whose patent has been previously found invalid must prove fundamental error to obtain a second trial on the merits.

11. The Court recognizes that its view of comity may make a substantive difference only in limited circumstances where a defendant can come forward with no new relevant evidence making summary judgment appropriate. The Court believes, however, that the views expressed herein will encourage settlements of disputes after an initial finding of validity unless the initial determination is infected with substantial error or is based on a seriously inadequate record.

content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved . . ." Graham v. John Deere, 383 U.S. at 17, 86 S.Ct. at 694. Additionally, "[s]uch secondary considerations as commercial success, long-felt but unsolved needs, failures of others, etc. might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented." Id.

Much of the prior art Zenith relies on was also introduced by Sylvania in the first litigation. The first piece of such prior art is an article written in July 1952 by Sam H. Kaplan entitled "Theory of Parallax Barriers," appearing in the Journal of the Society of Motion Picture and Television Engineers.[12] Kaplan was an employee of Zenith at that time working under Dr. Constantine Szegho, Zenith's principal expert witness in the instant litigation. The Kaplan article discusses the geometry of parallax barriers (shadow masks), including spherical barriers coupled with spherical screens. The Massachusetts court and the First Circuit, however, dismissed the Kaplan article as the "exegesis of geometric theory" (411 F.2d at 725 n.9), teaching nothing about the problems inherent in a practical application to color TV picture tubes. This Court agrees. Obviously, the article was available to those skilled in the art (TV engineers) but not one company, including Zenith, acted to build a curved shadow mask-curved screen tube until CBS demonstrated that such a tube was feasible. The reason for this is obvious. At the time the Kaplan article was published, no one in the industry thought a shadow mask free from lateral tension was feasible.[13] Without such a mask, the Kaplan theory was unworkable.[14] Fyler and Rowe taught the industry that such a mask, if spherical, was feasible because movement upon heating would be radial, not causing loss of color fidelity. Nothing in the Kaplan paper suggests this core concept of the '518 patent.

Additionally, although not cited in the '518 patent, the Kaplan article was specifically called to the attention of the Patent Examiner before the '518 patent issued. As stipulated, Zenith, on behalf of Kaplan, filed an application on the combination of a cylindrical shadow mask with a phosphor screen deposited on a cylindrical face plate. The Examiner suggested to Zenith that Zenith copy two of the Fyler and Rowe claims so that an interference might be set up to determine priority of inventorship. Rather than engage in such an interference, Zenith responded by citing the Kaplan paper in support of its contention that the proposed interference claims were not patentable.

Nevertheless, the Fyler and Rowe patent was issued, and the Patent Examiner presumably also thought the Kaplan article was nothing more than geometric theory. This judgment further strengthens the Court's view that the Kaplan article does not make the Fyler and Rowe patent obvious, even considering the high standards of those skilled in the art.

Zenith also relies heavily on an article in the French magazine *Nature* not cited in the Patent Office, known to the Patent Office, or cited in the *Sylvania* litigation. Two drawings in this 1951 article show a color TV tube with a curved mask and a curved phosphor screen on the face plate. Interestingly enough,

---

12. The Kaplan paper was a copy of a speech given to the same society in April 1952.

13. Others in the industry including Hannah Moodey, RCA tube engineer, and Dr. John Sheldon, a Corning Glass engineer, also conceived of a curved shadow mask coupled with a curved screen but abandoned the idea because it was thought that the mask had to be pre-stressed in the fashion of the RCA drumhead tube. It is physically impossible to pre-stress a curved mask.

14. Zenith contends the curved shadow mask, curved screen tube was not made because no one in the industry knew how to place phosphor dots on a spherically curved screen. This argument is not supported by the record. See pages 789–791, *infra.*

however, the captions beneath both of those figures refer to RCA tubes. In 1951 when the French article was published, RCA tubes were then of the drumhead type. Additionally, the article which is of the popular, non-scientific type, says nothing whatsoever about the response of a shadow mask to electron bombardment. It doesn't even state that the mask is bombarded or that it heats up. The article thus was nothing more than a general survey of various systems of color television purportedly as practiced in 1951. In the absence of any evidence that the *Nature* article taught anyone in the industry anything about the solution to an extremely difficult technical problem, this Court believes that the unexplained, misdesignated representation of a curved screen and mask did not aid those skilled in the art in producing such a tube.

Other prior art patents cited by Zenith do not constitute relevant prior art which would make the '518 patent obvious. These patents, the Bramley patent (U.S. Letters Patent 2,606,303), the Lawrence patent (U.S. Letters Patent 2,692,532), and the Okolicsanyi patent (Reissue Patent 23,672) do not contain any discussion of the thermal response or stability of a curved or spherical shadow mask. Moreover, these patents, unlike Claim 7 of the '518 patent in suit, do not use the shadow mask as a color selection device.

A "shadow mask" is defined in the art as a passive element which determines the color of the picture being presented on the screen by reason of the angle at which the electron beams approach it; in no way does it involve any active elements performing a switching function.

In contrast, Bramley, Lawrence and Okolicsanyi involve a radically different method of color selection. Bramley disclosed a tube where the phosphors were not placed directly upon the surface of the spherical face plate but were placed upon a transparent conducting layer. It was that conducting layer by which selection among the three colored phosphors was effected. The voltage between the conducting layer and a grid was cyclically varied in order to cause the electron beam to deflect from one phosphor color to another. Lawrence and Okolicsanyi employ principles similar to those employed in Bramley. It should also be noted that these three patents were basically paper patents. Apparently, a Bramley-type tube was never successfully built. The Lawrence tube was at best only used experimentally in the laboratory.

In determining obviousness, prior paper patents should be given little weight. Dart Industries v. E. I. DuPont, 348 F.Supp. 1338 (N.D.Ill.1972), rev'd on other grounds, 489 F.2d 1359 (7th Cir. 1973). In sum, the "prior art" Zenith has cited to the Court would not make the Fyler and Rowe invention obvious to one skilled in the art. The prior art cited is not so forceful as to reduce the presumption of validity attaching to any patent much less a patent previously found valid. The defendant therefore has not sustained its burden of proving invalidity for obviousness. 35 U.S.C. § 282.

This finding of non-obviousness is strenghtened by strong secondary evidence of patentability. Virtually all members of the color TV industry except Zenith eventually took licenses for the '518 patent. RCA, the industry leader, took a license almost immediately upon issue of the '518 patent.[15] In 1956, Sylvania also took a four-year license which cancelled out royalties CBS had been accruing as a contingency reserve against several court-approved Sylvania patents. Sylvania then balked at renew-

---

15. Zenith argues that the RCA license was a disguised partial rebate of royalties. Zenith was unable to prove this notion at trial. Considering the sizeable investment of money and prestige RCA had in color TV, it is likely that the license was a true judgment by RCA on patentability. Moreover, even if the license constituted a partial rebate of royalties, the net effect reduced RCA's economic position. That RCA was willing to reduce its economic position vis-a-vis CBS is also a measure of patentability.

ing its license and CBS brought suit. After the Supreme Court denied certiorari in the *Sylvania* litigation, CBS accepted settlement in the sum of $2,375,000. General Electric and Admiral, after the *Sylvania* litigation, settled suits with CBS for sums of $300,000 and $380,000 respectively. Philco, Westinghouse and Motorola also came to agreements with CBS, Philco paying $180,000, Westinghouse paying $145,000, and Motorola paying $400,000 for licenses. Six Japanese manufacturers also took licenses which paid aggregate royalties of over $3,000,000. The American affiliate of Dutch Philips also took a license which paid CBS over $75,000. Total royalties paid to CBS under the '518 patent amounted to over $8,100,000. The significant commercial success of CBS' patent, as noted above, is strong secondary evidence of non-obviousness.

■■■ Moreover, the immediate industry reaction to demonstration of the Fyler and Rowe tube also presents strong secondary evidence of non-obviousness. After some initial doubts as to the practicality of the Fyler and Rowe invention (an indicia of non-obviousness), the industry converted to the methods disclosed in the '518 patent. RCA abandoned the drumhead tube it had laboriously developed. Sylvania and Westinghouse also converted to the '518 tube. Zenith officials also immediately changed the course of their research and commenced construction of a curved shadow mask-curved screen tube. Thus, CBS has demonstrated that a long-standing need in the marketplace existed for a new type of color TV tube; the Fyler and Rowe invention fulfilled that need and was commercially successful. All of these factors, while not determinative alone, materially enhance the presumption of the validity of the patent.

C. *Adequacy of Disclosure Under § 112 of Screen Making Methods*

Thirty-five U.S.C. § 112 requires that the disclosure of a patent be in such terms that anyone skilled in the art to which the invention pertains can practice the invention. Zenith maintains (as did Sylvania in the prior litigation) that the '518 patent does not disclose the method of placing phosphor dots on a curved screen adequately within the meaning of § 112. The '518 patent does not describe a method of placing the phosphors on the screen but only states that this task may be accomplished photographically. Zenith argues that if any invention occurred at CBS it related to the method of laying down phosphor dots on a curved surface; once this was accomplished, the Fyler and Rowe invention was a simple piece of non-inventive engineering. This contention is not supported by the record. The CBS method of applying tri-color phosphor dot patterns to curved screens was known to those skilled in the art; as stated above, the Fyler and Rowe contribution to the art involved not the screen but the thermally stable shadow mask.

Developments in 1953 demonstrate that those skilled in the art could read the language of the '518 patent referring to a photographic process as an adequate disclosure of the method to lay down the screen. Within a few weeks after demonstration of the Fyler and Rowe tube, RCA and Sylvania constructed curved tricolor phosphor dot screens. These companies used the same methods that were involved in the CBS photographic process—mixing photoresist (a photosensitive material) with the phosphor chemicals and exposing by light rays through the shadow mask. Another leader of the TV industry in the early 1950's, Allan B. DuMont Laboratories, Inc., also had the ability to deposit phosphors on a curved surface. That company asserted prior invention of the spherical mask-spherical screen of the '518 patent. To implement its assertion, it copied claims from the '518 patent and provoked an interference. DuMont offered evidence that it, too, had successfully deposited phosphors on a curved surface as early as 1952. The interference was lost by DuMont, but not on the ground that they had failed to deposit phosphors successfully on a curved surface.

Knowledge was also available in widely distributed public sources about photographic methods to make a curved tricolor screen on the inside of the face plate. Dr. H. B. Law, RCA color tube scientist, conceived in 1948, five years prior to the application for the '518 patent, a photographic process for phosphor deposition and made this comment:

"Such a process would accommodate itself to a curve [sic] faceplate."

His concepts were embodied in patent applications filed in 1950 and 1951. The earlier filed application issued as U.S. Patent No. 2,625,734, January 20, 1953, several months prior to the June 1, 1953 filing date of the '518 application.

At the trial, it was pointed out that Dr. Law disclosed a photographic process for depositing phosphors on either flat or curved surfaces (even though he remained faithful to the RCA tensioned-mask drumhead philosophy). Specifically, the patent states:

"Accordingly, the present invention is concerned with and solves the following problems: (a) The construction of a *taut, planar, foraminous* mask. (b) The manufacture of a dot-liked, tricolor plane or *curved phosphor target* for use with said foraminous mask. . . ." (Emphasis added)

Another source of public information about the photographic process was the Sylvania scientists' (Levy and Levine) April 1953 article entitled "The Preparation of Phosphor Screens For Color Television Tubes." As Dr. Levine testified at trial, the methods described therein were directly applicable to the laying down of the phosphor photo-resist material on a curved as well as a flat surface.

It is also important to note that in the early 1950's Zenith scientists did not consider the creation of a curved surface phosphor dot array a major problem.

On May 13, 1953, about two weeks before CBS filed its application for the '518 patent on its spherical mask-spherical screen tube, Zenith's Kaplan reported to his superior Dr. Szegho (defendant's primary expert witness and research director in the 1950's):

"The photographic method can easily make a spherical phosphor screen."

Again, Kaplan reported on June 29, 1953 to Dr. Szegho:

"*Screen*—For simplicity this should be put on the faceplate rather than on a separate glass plate. The photographic process of screen making lends itself to putting the screen on the curved faceplate."

Dr. Szegho also thought the curved phosphor screen presented no problem. In abandoned U.S. Patent Application No. 446,698 filed July 30, 1954 he stated:

"Because the electron beam paths effectively constitute uninterrupted straight lines, a master pattern for the manufacture of the luminescent target may be produced by exposing a photographically sensitive plate or film through color-selection barrier 43 by means of a source of light located at a position corresponding to the plane of deflection of the tube, the photographic surface being mounted in position corresponding to that of the tube target. *This simple technique is a familiar one in the art* and represents an effective and economical method of manufacturing master patterns for the production of color television targets." (Emphasis added)

In another, earlier memorandum Dr. Szegho also cited the Levy and Levine article as describing how to make a curved phosphor dot array. This evidence is more credible than 1974 protestations that screen-making was the single stumbling block to a curved shadow mask tube.

■ In light of the above, the Court believes that CBS disclosed all that was necessary about screen making in the '518 patent. The phrase "photographic process" was industry shorthand for a well-known process, a process which only became important when Fyler and Rowe demonstrated that a curved mask free from lateral tension

could be coupled effectively with a curved screen because the mask remained in registry when heated. In making this holding, the Court is mindful of the compelling nature of § 112 which states that the monopoly grant is a *quid pro quo* for full disclosure. National Carbon Co. v. Western Shade Cloth Co., 93 F.2d 94 (7th Cir. 1939). However, the validity of a patent is not impaired by the fact that experimentation or the exercise of judgment is necessary to obtain the particular results desired. Armstrong v. Motorola, Inc., 374 F.2d 764 (7th Cir. 1967). Section 112 thus embodies a rule of reason. In re Coleman, 472 F.2d 1062 (C.C.P.A. 1972). Shorthand descriptions, if understandable by those skilled in the art, are acceptable under this rule of reason. The '518 patent contained an acceptable shorthand statement which would enable anyone skilled in the art of tube making to practice the Fyler and Rowe invention.

### D. *Zenith's Best Mode Defense*

Section 112 of the Patent Statute requires that the specification of a patent application "set forth the best mode contemplated by the inventor of carrying out his invention." Zenith argues, as did Sylvania in the previous litigation, that CBS violated this command by failing to reveal the best mode of mounting the shadow mask inside the tube. Since the mask must be removed several times during the phosphor screen making process and placed back into the tube with fantastic accuracy, the mask mounting is crucial. Zenith argues that the best mode contemplated for mounting the shadow mask in the CBS tube was the system disclosed in the later Fyler patent 2,961,560. Briefly, that patent contemplated a plurality of knobs formed in the inner wall of the glass tube envelope, best shown at 54 in Figure 3 of the '560 patent and arranged to cooperate with springs 51 to set the shadow mask 52 in predetermined locations.[16]

 Zenith, however, has failed to show that when the '518 patent was filed the '560 method was contemplated as best mode of practising the Fyler and Rowe invention. Fyler only suggested the '560 system to CBS on May 30, 1953. When the '518 application was filed, the '560 system remained untested. It was not until some time after August 1953 that CBS received from the Corning Glass Works a model color tube envelope to test the '560 system. Once these tests were successfully completed, CBS did disclose the best method of mounting the mask by making a new patent application. Obviously § 112 did not require CBS to do more, to disclose a system which at that time was only theoretical. The best mode requirement only requires disclosure of methods the inventor has reduced to practice.

To sum it up, at the time the '518 patent application was filed there was no "preferred mode" for mounting the mask. The only one tested was disclosed and the ball notch system was disclosed later when it had become established as preferred.

### IV.

## ENFORCEABILITY OF THE '518 PATENT

### A. *Fraud on the Patent Office*

 Zenith argues that the '518 patent is unenforceable because CBS practiced fraud on the Patent Office in its prosecution of the '518 patent application. To prove fraud on the Patent Office, Zenith must establish by clear and convincing evidence that CBS knowingly and wilfully concealed information from the Patent Office, that the information was not known to the Patent Examiner, and that the information concealed was material. See, *e. g.*, Carter-Wallace, Inc. v. Davis-Edwards Corp., 443 F.2d 867, 881–84 (2d Cir. 1971); see also Walker Processing Equip., Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965).

---

16. The '518 patent shows an arrangement in which the mask was held in place by screws passing through its rim.

■ Zenith's fraud on the Patent Office claim is comprised of two parts: (1) Zenith argues that the CBS patent counsel misrepresented the teachings of the Bramley and Okolicsanyi patents, and (2) CBS concealed from the Patent Examiner the Kaplan paper. Neither of these arguments is tenable. CBS voluntarily brought the Bramley and Okolicsanyi patents to the Examiner's attention. No misrepresentation occurred in these disclosures. George Crowley, the CBS patent counsel, described these patents in substantially the same terms as did the patent counsel or Patent Examiner involved in procurement of those two patents. With regard to the Kaplan paper it is unclear whether Crowley had knowledge of its existence prior to the issuance of the '518 patent. This fact becomes unimportant, however, because as previously stated, the Kaplan paper was brought to the attention of the Examiner who obviously did not regard it as effective prior art against the '518 patent. Since the article was known to the Examiner and was not material, Zenith's fraud on the Patent Office claim must fail.

## B. *Laches*

■ Zenith also contends that the '518 patent is unenforceable by reason of laches. To prove laches Zenith must show lack of diligence on the part of CBS. Zenith must also prove that it was injured by the delay. Baker Mfg. Co. v. Whitewater Mfg. Co., 430 F.2d 1008 (7th Cir. 1970); Technitrol, Inc. v. Memorex Corp., 376 F.Supp. 828 (N.D. Ill.1974). Zenith started production of color TV picture tubes in late 1962 or early 1963, thus any laches defense must be measured from that time. The chronology of events since 1962 demonstrates that CBS has not been dilatory in enforcing the '518 patent. Zenith was never allowed to believe that the '518 patent would not be enforced against it.

CBS began efforts to get Zenith to take a license for use of the '518 patent in September 1963. Negotiations continued by correspondence throughout 1964 and 1965. In January 1966, as part of the CBS industrywide licensing program, CBS sued Sylvania for infringement of the '518 patent. This action served notice on the industry that if negotiations were unsuccessful, litigation was likely. Zenith was aware of this lawsuit. Further, in February 1968, CBS sued Lechmere Tire & Sales Company, a retailer of Zenith television receivers. Zenith responded by filing a declaratory judgment action against CBS in New York in March 1968. CBS successfully moved to transfer the case to Boston, causing Zenith to take a voluntary dismissal of its complaint. CBS then brought suit in Boston in April 1970 against Northeastern Distributors, Inc., the exclusive distributor for Zenith in New England. Zenith again refused to defend its customer. CBS finally directly sued Zenith in March 1971.

■ The Court believes that these facts demonstrate that if this suit was unduly delayed, Zenith was as responsible as CBS. Zenith could have defended its customer in the 1968 action or prosecuted its 1968 declaratory judgment action, these events occurring well within the six year period from when it commenced manufacture of color TV picture tubes. Zenith, however, made a tactical decision at that point not to litigate in Boston. In light of previous CBS efforts to license the industry, Zenith must live with that decision. Its voluntary dismissal of the 1968 declaratory judgment suit and its refusal to defend its customers in 1968 and 1970 negate any claim of laches.

## C. *Patent Misuse*

■ Zenith's third defense against enforceability of the '518 patent involves the doctrine of patent misuse. Zenith contends that in negotiations with Japanese manufacturers, CBS asserted broad, invalid claims of the '518 patent. This argument has its genesis in a validity study undertaken by plaintiff's outside patent counsel. The study concluded that claim 7 of the '518 patent was valid but that claims 4, 5 and 11 were

probably invalid because anticipated by prior art. Zenith thus argues that CBS had a duty to disavow these claims in negotiations with the Japanese.

The facts in this record demonstrate, however, that in negotiations with the Japanese CBS did not rely on invalid claims. At the time the negotiations took place, the Japanese manufacturers produced only tubes with spherically shaped masks and spherically shaped phosphor dot screens. These tubes were clearly covered by claims CBS thought valid. In this context, CBS letters stating that it thought all curved shadow mask color TV tubes infringed its '518 patent cannot be said to encompass an attempt to broaden the scope of the patent. Additionally, CBS never received any royalties from any Japanese manufacturer for a system which was not spherically shaped, free from lateral tension. It should also be noted that the Japanese manufacturers involved were sophisticated industrial giants, operating world-wide. These companies took licenses only after extended negotiations ultimately involving the Japanese government. Under these circumstances, this Court can only conclude that the Japanese believed with good cause that the '518 patent was valid and that their tubes infringed it. Zenith has therefore failed to sustain its burden of showing misuse.

## V.

### INFRINGEMENT OF '518 PATENT

In adjudging the infringement issue, the Court must examine only claim 7 of the '518 patent, the only claim involved in CBS' accusation of infringement. Claim 7 is set out in Appendix A, below. The parties agree that the key operative language insofar as infringement is concerned is the support means for the mask must be "free of lateral tension" and the mask must be kept "in substantially fixed space relationship" to the phosphors. Zenith argues that its tubes fulfill neither of these requirements of claim 7.

The parties agree as to the legal standards applicable to the infringement inquiry. CBS, the patentee, has the burden of proving infringement. A device infringes a patent if it does the same work in substantially the same way, accomplishing substantially the same result even if the device differs in name, form, or shape. Graver Tank & Mfg. Co. v. Linde Air Prods., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1949). Moreover, the claims are to be read in light of the specification. United States v. Adams, 383 U.S. 39, 86 S. Ct. 708, 15 L.Ed.2d 572 (1966).

There is no question but that the two types of Zenith tubes in suit here are different than the tube described by Fyler and Rowe. Unlike the Fyler and Rowe tube, the Zenith tubes place the shadow mask in a heavy frame. The Zenith mask frame is attached to a tube envelope with single metal or bi-metal springs. As the Zenith tube heats up, these springs compress and Zenith contends that this feature imparts tension into the system avoiding infringement of the '518 patent. The springs also cause the frame to move slightly during the operating warm-up cycle; Zenith argues that this means that the mask is not in substantially fixed relationship with the phosphors, also negating infringement. The Court believes that the single metal and bi-metal springs are an improvement over the Fyler and Rowe patent but that Zenith still uses the basic '518 patent invention as contemplated by Fyler and Rowe. The Zenith tubes operate in the same way and produce the same result taught in the '518 patent. The addition of another improving element because it does not change the basic conception of the '518 patent does not negate infringement. King-Seeley Thermos Co. v. Reynolds Prods. Inc., 322 F.Supp. 713 (N.D.Ill. 1970). The Court reaches this conclusion based on several factors.

At trial, Zenith's expert, Joseph Fiore, a leading Zenith tube designer, conceded that both the masks and frames of the Zenith tubes were not under tension.

The mounting springs may be under tension but the tube is constructed in such a manner as to isolate this tension from the mask. In any event, the tension created by the springs is not lateral; it is in a plane perpendicular to the lateral plane. The Zenith mask and frame are annealed to relieve stresses created during fabrication. Zenith also deliberately relieves all lateral tension in its mask and the mask supporting rim to avoid misregistry during operational heating. This is basic to claim 7 of the '518 patent.

Language in Mr. Fiore's patents confirms this characterization of the Zenith tubes. Fiore patent No. 2,897,392 states that Zenith shadow masks cannot expand peripherally to any great extent and therefore thermal expansion of the mask results primarily in an increase in the curvature of the mask. Such expansion leaves the apertures in relative alignment with the phosphor dots. Another Fiore patent, No. 3,351,996, states that the frame used in Zenith tubes holds the periphery of the mask fixed and thus the thermal expansion of the mask is dome-like but no other significant physical movement occurs to cause misregistry. These two Fiore patents which describe the Zenith tubes obviously use the Fyler and Rowe invention articulated in claim 7 of the '518 patent.

The movement in the frame caused by the springs does not mean that the mask is not in substantially fixed space relationship with the screen. When the bi-metal springs compress during warm-up, the frame moves slightly forward, bringing the mask with it. This movement is not so large as to cause misregistry. The hot bi-metal springs do not impart lateral tension to the mask or its frame. Since the slight movement of the frame forward does not cause misregistry, within the meaning of Fyler and Rowe, a substantially fixed space relationship between mask and phosphors is main-

tained. CBS therefore has sustained its burden of proving infringement of the '518 patent. Both types of Zenith tubes, single metal and bi-metal spring assembly tubes, operate in the same way and produce the same result as taught in the '518 patent.[17]

## VI.

### THE GIUFFRIDA PATENTS

#### The Problem of Magnetic Deflection and the Giuffrida Solution

The Giuffrida patents also deal with maintaining color fidelity in shadow mask picture tubes. Difficulty had been encountered in production of color tubes because of the vertical component of the earth's magnetic field. The earth's magnetic field caused a slight bending of the electron beam to the left from the position of a viewer of the screen, thus the electron beams landed slightly to the left of their respective phosphor dots, degrading color fidelity. This problem was a consequence of the photographic method of screen making. The phosphor dots were produced by shining light beams through the shadow mask. Unlike electron beams, light beams are not affected by magnetic fields. Thus when the light beams expose phosphors, the dots formed are located at the expected points of landing assuming that the electron beams travelled in straight lines. Because of the deflecting of the vertical component of the earth's magnetic field this assumption was never true.

The Giuffrida patents solve the above stated problem in an elegantly simple manner. Giuffrida determined that shifting either the light source or the screen with respect to the shadow mask prior to photographic exposure of the phosphors in such a direction so that the dots would be formed in a location to compensate for the curvature in a horizontal direction of the electron

---

17. CBS also argues that infringement is proved because Zenith tubes can be substituted type-for-type with the infringing Sylvania tubes. The Court cannot accept this argument. Tube substitution is a consequence of similar receiver circuitry, not the internal construction of the picture tube.

beams. Prior to Giuffrida, two methods of counteracting the earth's magnetic field had been attempted. One solution involved placing a counteracting magnetic field around the tube, another method involved shielding the electron beams inside a mu-metal tube envelope. Both of these methods involved considerable additional cost in tube manufacture and did not entirely solve the misregistry problem.

Since at trial Zenith's expert witness, Fiore, conceded that the round Zenith tubes infringed claim 5 of Giuffrida patent No. 3,179,836, the sole issue remaining open is whether that claim is valid. Zenith's sole defense as to validity is based on obviousness. Zenith argues that claim 5 of '836 is made obvious by U.S. Patent No. 2,733,366 (the Grimm patent). The Grimm patent was cited by the Patent Office Examiner in references listed at the end of the '836 patent. In such an instance the presumption of validity is increased. The Court has examined Grimm and believes that under the Graham v. Deere criteria, Zenith has failed to rebut this presumption of validity. Grimm would not make the '836 patent obvious to one skilled in the art because it dealt with problems associated with the drumhead tube. The invention apparently was thought by those skilled in the art not to be transferrable to the Fyler and Rowe type tube.

This conclusion is strengthened by the behavior of RCA at the time CBS applied for the Giuffrida patents. RCA vigorously contested CBS' right to the Giuffrida patents, claiming priority of invention. This was done despite the fact that the Grimm patent had been assigned to RCA. RCA, as a skilled competitor, clearly must have thought that the Giuffrida technique materially enhanced the art to go through the expense of an interference litigation. This again provides secondary evidence that those skilled in the art thought Giuffrida was not obvious in light of Grimm.

## VII.

### ATTORNEY'S FEES AND TREBLE DAMAGES

CBS maintains that Zenith's infringement is wilful and wanton, allowing CBS to recover its attorney's fees and treble damages. 35 U.S.C. § 284. On this issue the burden is not on Zenith to prove exoneration but upon CBS to substantiate the charge. Anderson Co. v. Sears, Roebuck & Co., 265 F.2d 755 (7th Cir. 1959). CBS has not sustained this burden. The Court believes that Zenith corporate officials held a bona fide and reasonable belief that its tubes did not infringe the '518 patent. Moreover, Zenith presents several bona fide defenses to validity and enforcement requiring a full airing of the facts surrounding the '518 patent. The Court has rejected these defenses but finds they were made in good faith. In light of this Court's views as to the weight accorded to prior findings of validity, had Zenith relied only on the evidence and arguments presented in the *Sylvania* litigation, treble damages and an award of attorney's fees might have been appropriate. Zenith in this litigation did present enough new evidence, particularly in relation to infringement, to avoid additional liability because of the prior finding of validity. CBS' claim for attorney's fees and treble damages will therefore be denied.

## VIII.

### CONCLUSION

In sum, this Court finds Fyler and Rowe patent 2,690,518 valid, and claim 7 of that patent infringed by the Zenith single metal and bi-metal spring color TV picture tubes. The Court also finds Giuffrida patent 3,179,836 valid, and claim 5 of that patent infringed by the Zenith round faced tubes. A master will be appointed to determine the appropriate reasonable royalty to be assessed against Zenith. CBS shall recover its costs in prosecution of this suit.

It is so ordered.

[See following illustrations]

**FIG.1**

**FIG.2**

INVENTORS
Norman F. Fyler
William E. Rowe
By: *George W. Crowley*
ATTORNEY

Sept. 28, 1954 N. F. FYLER ET AL 2,690,518
 COLOR PICTURE TUBE

Filed June 1, 1953 3 Sheets—Sheet 2

**FIG. 3**

**FIG. 4**

INVENTORS
Norman F. Fyler
William E. Rowe

By: *George W. Crowley*
ATTORNEY

FIG. 7

FIG. 6

FIG. 5

INVENTORS
Norman F. Fyler
William E. Rowe

By: George W. Crowley
ATTORNEY

# UNITED STATES PATENT OFFICE

2,690,518

COLOR PICTURE TUBE

Norman F. Fyler and William E. Rowe, Newbury-
port, Mass., assignors to Columbia Broadcast-
ing System, Inc., Danvers, Mass., a corporation
of New York

Application June 1, 1953, Serial No. 358,712

11 Claims. (Cl. 313—70)

This invention relates in general to color television and in particular to picture tubes for use in color television receivers.

Terminal devices in color television systems have taken numerous forms. At this time, however, the emphasis is on cathode ray tubes utilizing phosphors generating the primary colors: red, blue, and green. In most present-day tubes, a separate gun is used for each type of phosphor, the phosphors themselves are usually disposed upon a flat plate either as minute dots or, in some instances, as stripes running either vertically or horizontally.

The present invention is primarily concerned with improved structures for tube types which utilize the phosphor dots or stripes and triple guns as mentioned above. In these tubes it has been the practice to mount three guns in the neck of the tube and to provide a single deflection yoke for the beams of these guns. The guns are disposed such that the electron beams converge in an opening in a so-called shadow mask or aperture mask. This shadow mask is and has been made of metal, or conductive glass, or other suitable material and is in the form of a thin perforated sheet. Adjacent the mask and on the side remote from the electron guns, a flat glass plate is placed. On this plate, in the case of the dot type phosphors, for each perforation in the aperture mask, there is disposed a trio of phosphor dots for generating each of the three primary colors. These dots are arranged relative to the holes of the mask and to the guns such that a straight line drawn from the point of deflection of the beam of each gun through any given hole in the aperture mask will strike only dots of the color associated with that gun. In other words, each electron beam as it scans, can strike only one dot of each trio and thus may excite only one color. As a result of this arrangement, all three beams can be modulated properly to produce a full color picture. In the case of the phosphor stripe types, the shadow mask has rectangular apertures therein, each aperture being centrally disposed relative to a group of three stripes, each of which emits a primary color upon excitation. Other structures, such as line grids adjacent the screen, have been used in conjunction with the phosphor stripes. Much background information has been published on various tubes of these types, particular attention being invited to the October, 1951, issue of "Proceedings of the Institute of Radio Engineers" which was devoted exclusively to color television papers.

Although some success has been achieved with tubes of the type briefly described above, numerous disadvantages have been encountered. Many of the disadvantages stem directly from the design of the tube. The preparation of a mask which must be maintained flat and parallel with a flat screen is a very difficult procedure. The mask is heated and kept at an elevated temperature by means of hot blocks or other cumbersome apparatus during assembly into its frame. The mask is clamped while hot across the frame and subsequent cooling causes shrinkage of the mask and considerable tension to be built up which tends to maintain the mask flat and parallel to the screen after assembly therewith. Despite these precautions, the mask becomes seriously distorted and buckles under the influence of heat created by electron bombardment when that bombardment exceeds a critical point. The effect of the bombardment is to enlarge the mask sufficiently to neutralize the initial elastic distortion introduced by hot blocking. When this point is reached, any slight further expansion in length or width of the mask causes a disproportionately large amplitude displacement of the mask. In other words, the flat mask actually flips to either side causing serious loss of registry between mask and screen.

The composite assembly is fastened in place within the conical end of the picture tube bulb. A face plate completes the envelope of the tube, and the screen is then viewed through this face plate. Of necessity, this face plate must have clear glass of excellent optical characteristics.

When exhausting the envelope of the completed tube, still another difficulty is encountered because of the extraordinarily heavy mass of the mask and screen assembly. Great quantities of occluded gases must be removed and it is not convenient to raise the temperature of the mass to the necessary degree in a reasonable length of time. The use of a screen smaller than the face plate makes for insufficient utilization of structure, the mass of a heavy frame and bulky clamping mechanism adds difficulties to assembly and exhaust procedures and the very weight and complexity of the structure makes handling and processing of the tube difficult and hazardous.

Two other problems, similar in nature, are encountered with the flat screen-flat mask structure. One is focus, it being necessary, of course, that each beam come to as small a diameter as possible at the point of contact with the screen. With a flat screen, a given focus voltage or cur-

2,690,518

**3**

rent can bring the beam to focus only at a spot or in any one of a series of substantially circular patterns. Thus, the need arises for dynamic focussing system wherein the focus voltage or current varies with deflection of the beam. The convergence problem is much the same. The three beams must be made to converge at each of the apertures of the mask in order that each may pass through to impinge upon the appropriate phosphor portion. The mask being flat, a dynamic convergence system is also required. Any modification of tube or system to eliminate the need of such special circuitry as is required for dynamic convergence and dynamic focus would be a desirable advance.

Other objectionable features of current color picture tubes are the light loss which necessarily exists as the light passes from the phosphors through the phosphor screen glass and then through the actual face plate of the tube, and, worse, light emanating from the screen being reflected from each surface of the face plate of the tube back to the screen. In this fashion, ghosts are created which dilute the color of the original image, give discomfort in viewing, and, in general, detract from the quality of the picture being presented.

Therefore, it is an object of the present invention to provide a design for a color picture tube which is of simple construction and greater efficiency than those presently being used.

It is a further object of the present invention to provide a color picture tube having higher contrast than present tubes.

It is a still further object to provide a color picture tube of a design which is adaptable to existing and suggested types of picture reproducers.

It is another object to provide a color picture tube structure in which screen and mask are inherently of great mechanical strength.

It is still another object to provide a picture tube requiring negligible convergence circuitry and voltages.

In general, the present invention consists in the combination of a bulb having a curved face plate and a curved shadow mask, or grid, as required by the type of presentation being used. In addition, the phosphors for emitting light of appropriate colors are disposed directly upon the face plate of the tube. The structure of the tube is simple and follows conventional glass bulb design, the only departure from standard structure being in the conical portion adjacent the face plate wherein provision is made to accommodate a shadow mask, or grid. The phosphors on the face plate of the tube may be deposited in any one of several ways, photographic means, however, being preferred. For a better understanding of the invention, together with other and further objects, features, and advantages, reference should be made to the following description which is to be read in connection with drawings in which:

Fig. 1 is a perspective view of an embodiment of the invention which includes phosphor dot trios and a shadow mask having circular perforations.

Fig. 2 is a section taken through the screen end of a tube similar to that shown in Fig. 1, the curvature of screen and mask being exaggerated;

Fig. 3 is a perspective view of an alternative embodiment of the invention which utilizes vertical phosphor stripes and an aperture mask having rectangular openings;

**4**

Fig. 4 is a section taken through the screen end of a tube similar to that shown in Fig. 3 showing details of screen and mask and the means of attachment;

Fig. 5 is a perspective view of a color picture tube which incorporates a line grid adjacent the screen;

Fig. 6 is a sectional view of the screen end of a tube similar to that shown in Fig. 5 showing details of screen and grid, the curvature of both these members being exaggerated; and

Fig. 7 is a cut away view of an end portion of grid and screen of a tube similar to that shown in Fig. 5.

Referring particularly to Fig. 1, a picture tube 12 is illustrated. Within the neck of tube 12 are three electron guns 13, 14, and 15. At the upper end of tube 12 is a screen 16 which has the shape of a spherical section. Deposited upon screen 16 are myriads of phosphor dots and overlying the phosphor dots is a film of aluminum 17. The phosphor dots are arranged in trios having red, blue, and green light emission characteristics. At a short distance along the cone of the tube from the screen 16 is a metallic flange 18. Metallic flange 18 is composed of two roughly similar members, the upper or screen portion of bulb 12 being sealed to one of these members and the lower or conical section being sealed to the other member, the members being welded together. Aluminum film 17 contacts the upper member and a graphite coating 20 the lower member of flange 18. Details of flange 18 and its function may be better seen and will be explained further hereinbelow in the discussion of Fig. 2. Within tube 12 and supported from upper member of flange 18 is a domed mask 19. Mask 19 contains an opening for each of the phosphor trios mentioned above. The opening in each case is disposed centrally relative to a given trio of phosphor dots. In other words, the apertures in mask 19 are arranged relative to screen 16 and guns 13, 14, and 15 such that a beam emanating from any one of the guns and being deflected across the shadow mask 19 can, in passing through any one of the circular apertures, impinge on only those phosphor dots of a given color. Both the screen 16 and the shadow mask 19 are curved to form spherical sections. It has proven desirable to have the radius of curvature of the screen 16 slightly mismatched to that of the shadow mask 19. It should be noted, however, that excellent performance may still be obtained with matched curvatures for both screen and mask.

The spherical configuration of screen 16 results in substantially perfect focussing of each beam over the entire screen of the tube without resort to dynamic focussing circuits. Similarly, the spherical configuration of mask 19 results in substantially perfect convergence of the three beams in each aperture formed in mask 19. Placement of the phosphors so as to form the screen directly on the face plate of the tube permits the full amount of light emanating from the phosphors, less only that lost in transmission through the screen glass itself, to be available to the viewer. In this connection, the screen being made of dark glass adds to the contrast of the picture. Too, the increased light efficiency obtained permits the outer screen surface to be frosted if that is desirable to reduce specular glare, light output being ample despite the frosted surface of the screen.

Several mechanical and process gains are also obtained. The spherical mask configuration sim-

2,690,518

**5**

plifies assembly technique, no preheating or maintenance of tension by heavy frame and clamp devices being needed. As is obvious from the drawing and description, the rim is used to support the spherical mask from the flange. This, of course, increases pumping speed when the tube is in process and lowers the cost by a considerable amount both in parts and in process. Most important, the disadvantages of buckling and distortion mentioned hereinabove in the discussion of the flat mask are completely overcome. In a structure of curved cross-section, such as the mask in the present invention, such expansion and contraction as may be encountered is taken up over the entire surface and is partially in a direction parallel to the tube axis resulting in negligible amplitude displacement or loss of registration between mask and screen.

Referring now to Fig. 2, various details of the actual structure of the mask 19, screen 16, and bulb 12 are apparent. A conventional bulb is first made, then the section adjacent the screen end is cut off. The screen section is sealed to a flange member and the conical section is sealed to a similar flange member. The phosphors are photographically deposited in the screen end and then aluminized to enhance light output. A suitably curved shadow mask is prepared and attached to the screen end. The screen section and the conical section are then brought together and a heliarc weld is made to join the flange members. This process generally outlined, as applied to the embodiment shown in Fig. 2, results in a curved screen 16 having phosphor dots symmetrically deposited over its entire inner surface in trios. Each trio includes a red, a green, and a blue light-emitting phosphor dot. A shadow mask 19, curved to substantially conform to the curvature of screen 16 has a rim 21. Rim 21 is attached to the upper or screen member of flange 18 by means of three screws which are threaded into that member through rim 21 at three points spaced 120° apart about rim 21. Screw 22 and its attachment are representative as visible in this view of one type of retaining device which may be used.

Referring now to Fig. 3, there is disclosed a tube which is similar in many respects to that shown in Fig. 1. The bulb 31 is entirely similar to bulb 12 and the electron guns 32, 33, and 34 are identical to the electron guns 13, 14, and 15. The flange 35 is made up of two members similar to the members making up flange 18. Screen 36 is spherical in contour as is the shadow mask 37, again following the design illustrated in Fig. 1. In this embodiment, however, the shadow mask 37 has a number of rectangular apertures formed therein. The phosphors deposited upon screen 36 are vertical stripes running cyclically, red, green, and blue. For each group of three phosphor stripes on screen 36, there exists a single rectangular aperture which is centrally disposed relative to a group of three phosphor stripes. The rectangular apertures in mask 37 ideally would run entirely across the screen, but to provide sufficient structural strength, each rectangular opening is broken up into a series of rectangular apertures by a series of ribs which are discontinuous from one rectangular opening to another.

The mask 37 is domed to conform to screen 36 and it is held in place by means of three screws or other suitable retainers spaced about the periphery of the mask, screw 38 being visible in this view. The actual method of attachment may be

**6**

better seen by reference to Fig. 4 which is discussed hereinbelow.

The tube includes an aluminum film 30 which overlies the phosphor stripes to increase contrast, film 30 being carried back to actually contact the upper member of flange 35. Also, as is conventional, a graphite coating 39 is placed within the tube and it also extends to flange 35, contacting the lower member thereof.

The operation of the tube shown in this embodiment is similar to the operation of the tube shown in Fig. 1. Each of the electron beams emanating from gun 32, 33, or 34 can impinge upon phosphors of only one light-emitting type. In other words, as a beam, for example, from gun 32 is scanned across the screen 36, straight lines traced from the point of deflection of the beam from that gun through the apertures of mask 37 impinge upon only phosphor stripes for producing red light. Beams from guns 33 and 34 similarly can excite only phosphors for producing green and blue light respectively.

Referring now to Fig. 4, a sectional view, cut away to show details, is illustrated. The upper member of flange 35 is threaded to receive screw 38 which passes through the rim of mask 37. As mentioned hereinabove, three screws of this type are used to retain mask 37 in place. The sectional view shown here indicates the operation of mask 37. Beams from guns 32, 33, and 34 pass through the rectangular aperture through which this section is taken. By virtue of the displacement of the electron guns relative to one another, the directions of the beams are such that each strikes a phosphor stripe of the group of this color. The same holds true, of course, for each group of phosphor stripes and its associated rectangular aperture. Here, as in the version of the tube shown in Figs. 1 and 2, a heliarc weld is made between the extremities of the two members of flange 35 when the tube is completely assembled.

Referring now to Fig. 5 of the drawing, there is shown a bulb 41 having a cylindrical face 42 upon which phosphors are deposited in parallel stripes to form a screen. To enhance brightness, a thin film of aluminum 43 overlies the phosphor stripes. Bulb 41 is of the rectangular screen type, for ease of accommodation of the various elements making up the tube, but could have a circular screen and be used with equally good results. As in the case of the other types described hereinabove, a flange 44 surrounds the envelope of bulb 41 adjacent the screen end. Flange 44 comprises two members, one sealed to the screen portion and the other to the conical portion of the bulb, the two members being welded together to form the final assembly. Aluminum film 43 and a conventional graphite coating 54 are carried to a point of contact with flange 44. A frame 45 is supported at its corners from the upper member of flange 44, the tongue and screw at 46 being one suitable type of retainer. Frame 45 includes arcuate combs 47 and 48, the upwardly facing surfaces having radii of curvature closely matching that of the cylindrical face of the screen. Grid wires 49 are stretched in parallel relationship from cone 47 to cone 48. The spacing of these wires has been exaggerated in order that the operation of the device may be more easily seen. The distance from grid wires 49 to the phosphors on screen 42 has also been exaggerated to indicate more clearly the separation of the three beams from electron guns 51, 52, and 53.

2,690,518

In Fig. 6, a section of the tube shown in Fig. 5 is illustrated. As in the case of the other versions of the invention disclosed above, the two members comprising flange 44 are welded together at their extremities. Tongue and screw 46 attach mask frame 45 to the upper member of flange 44, similar tongues and screws being utilized at the other three corners of frame 45.

In Fig. 7, detail of screen 42 is shown. A section taken along the longitudinal axis of the tube shows grid wires 49, and electron beams are represented as passing between a pair of those grid wires. The aluminum film 43 is cut away to better indicate the impingement of specific electron beams upon specific phosphor stripes.

The version of the tube discussed above in reference to Figs. 5, 6, and 7, may be operated in a manner entirely similar to the embodiment shown in Figs. 3 and 4. However, by simple modification, operation of this embodiment may be had with comparable advantages where alternate grid wires have potentials for beam shifting applied thereto. That is, switching with a single gun, or correction of beam position in the case of three guns, may be obtained without departure from the concepts of the present invention. The major modifications required would be to insulate alternate grid wires from each other, either by the use of metallic combs with inserts of insulating material, or by the use of insulating surfaces at the point of contact between combs and grid wires and to provide suitable electrical connections through the bulb to appropriate grid wires. Although the embodiments of the present invention now preferred include only spherical mask and screen surfaces or cylindrical mask and screen surfaces, most of the advantages of the invention can be realized by use of matched parabolic, hyperbolic, or elliptical surfaces for screen and mask. Such matched curved surfaces used in conjunction with phosphors deposited in the manner disclosed directly upon the screen of a picture tube are believed to be within the purview of the invention which should be limited only by the spirit and scope of the appended claims.

What is claimed is:

1. A picture tube for the presentation of television images in color comprising, an envelope having a curved surface, phosphors for emitting light of the three primary colors, red, blue, and green being symmetrically disposed in groups of three light-emitting types in discrete portions in a single layer over said surface within said envelope, three electron guns within said envelope, each of said guns generating an electron beam to excite separately phosphor portions of each light-emitting type, a mask having a contour substantially matching that of said curved surface disposed within said envelope between said electron guns and said curved surface, but closer to said curved surface, said mask having a plurality of apertures formed therein, said apertures being so disposed relative to said curved surface and said electron guns that the beam from each gun can trace a straight line from the deflection plane thereof to only phosphor portions of a given light-emitting type, and support means free of lateral tension projecting inwardly of the inner wall of said envelope around at least a portion thereof for retaining said mask in substantially fixed spaced relationship to said curved surface.

2. In a color television picture tube having three electron guns and a curved viewing screen on which phosphors for generating light of three primary colors are deposited, means for limiting the impingement of the beam from each gun to phosphors of a given light-emitting type comprising, a mask disposed adjacent said curved screen, said mask being shaped to substantially conform to the curvature of said screen and having a plurality of apertures formed therein for the passage of beams from said guns and means for supporting said mask in substantially fixed spaced relationship to said curved screen, said mask being free of lateral tension.

3. A color television picture tube comprising, an envelope having a conical section, a neck section joined to the smaller end of said conical section, and a spherical screen section joined to the larger end of said conical section, first, second, and third electron guns symmetrically disposed in said neck section, phosphors for generating light of red, green and blue colors respectively being deposited symmetrically in groups of three discrete portions in a single layer over substantially the entire inner surface of said spherical screen section, each of said groups including a red, a green, and a blue light-emitting phosphor, a mask disposed adjacent said spherical screen section between said phosphors and said electron guns, said mask having a series of apertures formed therein and being so disposed relative to said phosphor portions and said guns that beams from said first gun impinge only upon said phosphor portions for generating red light, beams from said second gun impinge only upon said phosphor portions for generating green light, and beams from said third gun impinge only upon said phosphor portions for generating blue light, and means for supporting said mask in substantially fixed spaced relationship to said spherical screen, said mask being free of lateral tension.

4. A picture tube for the presentation of television images in color comprising, an envelope having a curved viewing surface, phosphors for emitting light of three primary colors being symmetrically disposed in discrete portions in a single layer on said curved surface, means for generating at least one electron beam for exciting said phosphors, a mask having apertures formed therein for the passage of electrons therethrough to said phosphors, said mask having a contour substantially similar to that of said curved viewing surface, and means directly connecting peripheral portions of said mask to corresponding portions on the inner wall of said envelope.

5. A picture tube for the presentation of television images in color comprising, an envelope having a curved viewing surface, phosphors for emitting light of three primary colors being symmetrically disposed in discrete portions in a single layer on said curved surface, means projecting inwardly of the inner wall of said envelope around at least a portion thereof and an aperture mask having a contour substantially similar to that of said curved viewing surface, said last named means providing direct support for said mask.

6. A picture tube for the presentation of television images in color comprising, an envelope having a curved viewing portion, a conical portion, and a neck portion, said conical portion being joined to said viewing portion at its large end and joined to said neck portion at its small end, phosphors for emitting light of three primary colors being symmetrically disposed in discrete portions in a single layer on said viewing portion, at least one electron gun disposed in said neck portion, an internally projecting means in

**9**

said envelope adjacent the junction of said conical portion and said viewing portion, and a mask curved to conform substantially to said viewing portion retained in position by said internally projecting means, said mask being free of lateral tension, being disposed in substantially fixed spaced relationship to said viewing portion and having a plurality of apertures formed therein for the passage of beams from said electron gun to the phosphors on said viewing portion.

7. A picture tube for the presentation of television images in color comprising, an envelope having a viewing end having substantially the configuration of a spherical surface, phosphors for emitting light of three additive primary colors upon excitation by an electron beam, said phosphors being symmetrically disposed in a plurality of groups of three light-emitting types in discrete portions in a single layer on said viewing end within said envelope, three electron guns within said envelope for generating electron beams, an aperture mask having a contour substantially matching that of said viewing end disposed adjacent said viewing end, said mask having a plurality of circular apertures formed therein, each aperture of said mask being formed adjacent one of said groups of phosphors, said circular apertures being so disposed relative to said three electron guns and said groups of phosphors that the electron beam from each gun is directed to impinge upon only phosphors of one light-emitting type, and support means free of lateral tension projecting inwardly of said tube for retaining said mask in substantially fixed spaced relationship to said viewing end.

8. A picture tube for the presentation of television images in color comprising, an envelope having a curved viewing surface, phosphors for generating light of red, green, and blue colors symmetrically disposed in groups of three different colored light emitters upon said curved viewing surface, three electron guns mounted within said envelope remote from said viewing surface, a mask disposed adjacent said viewing surface between said viewing surface and said electron guns, and support means free of lateral tension projecting inwardly from the inner wall of said envelope for maintaining said mask in substantially fixed spaced relationship to said viewing surface, said mask having a plurality of apertures formed therein and being so oriented that beams from one of said electron guns are directed to impinge only on phosphors for generating red light, beams from the second of said electron guns are directed to impinge only on phosphors for generating green light, and beams from the third of said electron guns are directed to impinge only on phosphors for generating blue light.

9. A picture tube for the presentation of television images in color comprising, an envelope having a curved viewing surface, phosphors for generating light of three additive primary colors disposed in groups of three discrete circular portions on said viewing surface, each phosphor por-

**10**

tion of each group generating a different one of said three additive primary colors upon excitation thereof, three electron guns disposed within said envelope, an aperture mask disposed adjacent said viewing surface and having one circular aperture formed therein for each group of three phosphor portions, and internally projecting means on said envelope for retaining said mask in substantially fixed spaced relationship to said curved viewing surface, said mask being free of lateral tension and oriented such that beams from each of said electron guns are directed to impinge upon and excite phosphor portions of different color generating types.

10. A color television picture tube comprising, an envelope having a curved viewing surface, phosphors for generating light of three additive primary colors being disposed sequentially in stripes on said viewing surface, three electron guns disposed in said envelope, internally projecting apparatus within said envelope adjacent said viewing screen, and a mask retained in position by said internally projecting apparatus, said mask being free of lateral tension and having a plurality of rectangular openings formed therein, said openings being shaped similarly to said phosphor stripes and being disposed relative to said phosphor stripes and to said electron guns that beams from one of said electron guns are directed to impinge only upon phosphor stripes for generating light of a first additive primary color, beams from the second of said guns are directed to impinge only upon phosphor stripes for generating light of a second additive primary color, and beams from the third of said guns are directed to impinge only upon phosphor stripes for generating light of a third additive primary color.

11. A color television picture tube comprising, an envelope having a viewing surface having the shape of a cylindrical section, phosphor stripes for generating light of three additive primary colors being disposed upon said viewing surface, at least an electron gun for generating electron beams to excite said phosphors, internally projecting apparatus on the wall of said envelope, a mask including two widely spaced combs having cylindrical surfaces adjacent to and conforming with said cylindrical viewing surface, and a grid of closely spaced wires stretched between said combs on said cylindrical surfaces, said mask being directly supported in position by said internally projecting apparatus.

**References Cited** in the file of this patent

UNITED STATES PATENTS

| Number | Name | Date |
|--------|------|------|
| 2,595,548 | Schroeder | May 6, 1952 |
| 2,630,542 | Goldsmith | Mar. 3, 1953 |
| 2,635,203 | Pakswer | Apr. 14, 1953 |

FOREIGN PATENTS

| Number | Country | Date |
|--------|---------|------|
| 866,065 | France | Mar. 31, 1941 |